(No. 47488.—

THE CITY OF EVANSTON, Appellant, v. RIDGEVIEW
HOUSE, INC., *et al.*, Appellees.

*Opinion filed May 28, 1976.—Rehearing denied June 28, 1976.*

42

Jack M. Siegel, Corporation Counsel, of Evanston, for appellant.

Jerome H. Torshen, Ltd., of Chicago (Jerome H. Torshen, Maria A. Skirnick, and Edward G. Wierzbicki, of counsel), for appellees.

MR. JUSTICE CREBS delivered the opinion of the court:

The plaintiff appealed to the appellate court from an order of the circuit court of Cook County granting the defendants' motion for judgment at the close of the plaintiff's case. We have granted a motion pursuant to Supreme Court Rule 302(b) (Ill. Rev. Stat. 1973, ch. 110A, par. 302(b)) to transfer the appeal to this court.

The original complaint for injunction filed by the plaintiff against Ridgeview House, Inc., prayed for writs of injunction restraining the defendant, an operator of a sheltered care home, from housing any persons suffering from mental retardation or mental disorders and ordering the defendant to remove from the Ridgeview House any person suffering from mental retardation or a mental disorder. The court granted the petition of the Department of Mental Health of the State of Illinois to intervene as a defendant. An amended complaint was subsequently filed against both defendants. The amended complaint sought the same relief prayed for in the original complaint and also sought an injunction restraining the defendants from operating a sheltered care home.

The property in question had been a hotel located in an area of the city of Evanston that was zoned for business. Sheltered care homes and nursing homes were not permitted in the area. In 1970, the defendant Ridgeview House, Inc., filed an application for a special use permit to convert the hotel into a sheltered care facility. On June 16, 1970, a public hearing was held by the Zoning Board of Appeals of the city of Evanston, and the Board heard extensive testimony concerning the proposed use of the Ridgeview House. The Zoning Board of Appeals then recommended to the city council of the city of Evanston that the special use permit be granted subject to certain conditions. In September, 1970, the city council adopted Ordinance 60—0—70 granting the special use permit for a sheltered care facility. The ordinance

specifically provided, however, that the special use permit was subject to certain conditions. Condition No. 13 is relevant to this appeal and provides:

> "that persons suffering from mental retardation or mental disorders apt to make them a burden to the other residents or to the surrounding neighborhood shall not be permitted to reside in the sheltered care facility."

After the special use permit was granted, the Ridgeview House was remodeled and began operation as a sheltered care home. Many individuals who had been patients of the Department of Mental Health were subsequently released by the Department and placed at the Ridgeview House.

In October, 1973, the city of Evanston refused to issue a renewal license to Ridgeview House, Inc., for the operation of a sheltered care home. The city alleged in part that Ridgeview House was being operated in violation of the special use permit. Ridgeview House continued to operate as a sheltered care facility, however, and the city then filed suit for injunctive relief. The amended complaint alleged that the Ridgeview House was occupied by many persons who suffer from "mental retardation and other mental disorders." The complaint further alleged that a substantial number of the Ridgeview House residents have proven to be a burden to other residents of the house and to the surrounding neighborhood. The complaint also alleged the city was justified in denying a renewal license to the Ridgeview House because the quality of care provided to the residents was insufficient. Finally, the complaint declared that representatives of Ridgeview House, Inc., had made certain misrepresentations to the Zoning Board of Appeals and that the special use permit was granted in reliance upon those statements.

The defendant Ridgeview House, Inc., filed an answer admitting that the Ridgeview House is occupied by some persons who suffer from mental retardation or who have

previously been treated in Department of Mental Health facilities, but generally denying the other material allegations of the complaint. The Department of Mental Health filed an answer challenging the constitutionality of Ordinance 60—0—70.

There was a bench trial in July, 1974. At the close of the plaintiff's case, the defendants moved for judgment in their favor. The trial court subsequently granted the defendants' motion. The court also found that condition 13 of Ordinance 60—0—70 was unconstitutional in that it violated article I, sections 2 and 19, of the Illinois Constitution, violated the fifth and fourteenth amendments to the Constitution of the United States, and was void for vagueness.

A summary of the evidence is necessary for a determination of the issues raised in this appeal. The first witness to testify at the trial was Dr. Prakash Desai, a physician and psychiatrist who was the regional administrator for Region Two of the Illinois Department of Mental Health. Dr. Desai explained that a sheltered care home is intended to house people who are not capable of independent living and who need some type of nursing care. A nursing home is distinguished from a sheltered care home in that residents of a nursing home need more skilled nursing. The doctor stated that the difference between the two types of homes is a question of the degree of nursing care provided. Dr. Desai testified that the Ridgeview House has been used as a placement for patients who leave the various mental health centers utilized by the Department of Mental Health. He stated that patients are not placed in the Ridgeview House unless they have recovered to a certain degree. Dr. Desai was under the impression that psychotrophic drugs were administered at the Ridgeview House to former patients of the Department of Mental Health. Psychotrophic drugs were described as those having an effect on the psychological condition of the person taking them, and the drugs could be administered

to treat psychosis, depression, neurotic conditions or anxiety.

Dr. Desai further testified that patients are not placed in a sheltered care home unless they have the potential to adjust to the community and that individuals who manifest extremely inappropriate behavior are not placed in such a home. The Department's policy is that patients who are discharged and subsequently placed in a sheltered care home are followed up by the Department for at least a year.

The next witness was William Taylor, who was employed at the Ridgeview House during the month of March, 1974, to dispense medication to the residents and to otherwise assist the residents. He stated that he worked on the seventh floor of the Ridgeview House, that about 90 percent of the 40 residents on the floor received medication, that he had received no training to dispense medicine and that he was aware of occasions when mistakes were made in dispensing medication. Taylor further testified that he observed several individuals at the Ridgeview House who were mentally handicapped or mentally retarded. Counsel for defendant Ridgeview House, Inc., then stipulated that there were mentally retarded people living in the Ridgeview House.

Harriet Ricks testified that she had been in Ridgeview House several times to visit her husband. She stated that she observed several residents of the Ridgeview House who were confused, frightened or depressed and who talked to themselves. She also observed a man who played with toy trucks, a man who spoke to artificial flowers and another man who constantly hopped on one foot while masturbating.

Cynthia Sympson testified that she had been to the Ridgeview House on several occasions to visit her father. She observed residents who spoke to themselves and also noticed a man who hopped on one foot while masturbating. In addition, she testified that the house was not kept clean.

Dr. Bernard Wolfberg testified that he is a consulting psychiatrist at the Ridgeview House. His duties were to provide in-service education to the staff of the Ridgeview House and to see certain residents of the house upon requests from the staff. Dr. Wolfberg believed that he had seen about 100 residents of the Ridgeview House in the year that he had been employed there. The doctor stated that he did see a few residents who had some symptoms of mental illness. He referred those residents to treatment facilities that he deemed appropriate. Dr. Wolfberg testified that he hospitalized a few of the residents of Ridgeview House so that they could be treated for mental illness. He had also recommended that one or two residents be returned to the Department of Mental Health. Those patients returned to Ridgeview House after they were considered cured. Dr. Wolfberg stated that housing people suffering from mental retardation in close proximity with normal persons probably would not have an adverse effect upon the normal persons. He then stated, however, that some people may be depressed by living in close proximity with mentally retarded people who were not in a state of remission.

On cross-examination, Dr. Wolfberg testified that the fact that an individual has a mental illness does not mean that the individual is dangerous to himself or to others. He also stated that the residents whom he had seen at the Ridgeview House were able to adjust to the facility and were living comfortably.

Bertram Miner, the president of Ridgeview House, Inc., testified that about 400 people reside at the house and that about 185 had been placed there by the Department of Mental Health. Miner stated that he was familiar with condition 13 of City Ordinance 60—0—70. He interpreted the condition to mean that mentally ill individuals who were still under treatment for their illness could not be accepted by the Ridgeview House. Miner testified that approximately 45 to 50 people who were mentally retarded were placed at the Ridgeview House.

Gilbert Cohen testified that he has been the administrator of the Ridgeview House since March, 1974. He had been employed from 1969 to 1974 by an organization that operated two nursing homes and one sheltered care home. At various times during that five-year period he was the co-administrator, administrator or executive director of each such home. Cohen testified that three registered nurses and three licensed practical nurses are employed at the Ridgeview House and that sheltered care homes, unlike nursing homes, are not required to employ licensed nurses. Cohen stated that Ridgeview House also employs 30 to 34 orderlies and has a total of 90 to 100 employees. Eight to ten physicians or other medical practitioners are attached to Ridgeview House on a permanent basis. Cohen further testified that about 85 percent of the residents receive some type of medication. He also stated that Ridgeview House has a social rehabilitation program, staffed by five full time employees and one part time employee, which is designed to prepare residents for community living. Cohen testified that three employees of the Department of Mental Health come to the Ridgeview House on a regular basis to monitor the status of all residents placed at the house by the Department.

On cross-examination, Cohen stated that the personnel at the Ridgeview House consists of a nursing department, a social rehabilitation department, an activity department, a maintenance department, a business staff, and two men whose duties are to clean the house. He said that, while the law does not require that sheltered care homes have a nursing staff, the Ridgeview House has such a staff in order that it would be a high quality home. Cohen further testified that some of the residents at the Ridgeview House are mentally retarded but that those residents were educable or trainable. He stated that mentally ill patients are not treated at the Ridgeview House and that Dr. Wolfberg is primarily a consultant to the staff and not a treating psychiatrist. Cohen was of the

opinion that no present resident of the Ridgeview House was apt to be a burden on others. Cohen had observed such residents at the facility in the past, but in those cases he always arranged to have the resident placed in another facility.

According to Cohen, referrals from the Department of Mental Health are screened before being placed at the Ridgeview House, and about half of those referrals are rejected. Participating in that screening process are staff members of the Ridgeview House, representatives of the Department and, until the September preceding the trial, a representative from the Evanston Mental Health Department. Cohen testified that the representative from the city was withdrawn by her superior. He also said that he has invited representatives from the city of Evanston to participate in the screening process but that the offer has been refused.

Dr. Jack Saporta, a clinical psychologist and an employee of the Department of Mental Health, testified that his duties involve interpreting and implementing policies of the Department in a geographical area that includes the Ridgeview House. He stated that he is familiar with the Department's policy concerning placing individuals at the Ridgeview House. Dr. Saporta explained that some of the people placed at the Ridgeview House by the Department had mental problems diagnosed as chronic brain syndrome, inadequate personality, schizoid, schizophrenia, paranoid schizophrenia, hebephrenic or catatonic. He indicated that a patient is not likely to be placed in a sheltered care home, however, if he is seriously mentally disturbed or disabled. Dr. Saporta later testified that the Department's policy is that a patient will not be discharged if there are acute symptoms of illness still present and that a patient must be at some level of remission if he is to be placed at a sheltered care home.

Robert Ray testified that he is employed by the Department of Mental Health and that his duties are to

supervise a staff of mental health workers who monitor individuals who have been placed by the Department in facilities such as the Ridgeview House. Ray stated that three of his subordinates spend some time at the Ridgeview House monitoring the overall program at the house, checking to see that the residents get adequate care and consulting with the staff at the house. Ray and his staff do not actually provide treatment of the residents. Ray further testified that he is involved in the screening procedure used to determine which people should be placed at the Ridgeview House. One part of that screening procedure is a meeting among Ray's staff, a representative of the Ridgeview House and, until the September before the trial, a member of the city of Evanston Mental Health Service. According to Ray, an individual would not be placed at Ridgeview House if any person at the meeting objected. The Ridgeview House never accepted a placement objected to by the representative of the city. Ray also stated that no person would be placed in a sheltered care facility if that person was considered dangerous to himself or to others.

Lois Roewade is a resident of Evanston who lives less than a block from the Ridgeview House. She testified about several incidents allegedly involving residents of the Ridgeview House. She stated that she observed a female resident of Ridgeview House walking in the alley on a cold winter morning dressed only in a robe and slippers. On another occasion, Mrs. Roewade was in the park across the street from the Ridgeview House with her daughter when she observed a female resident of the Ridgeview House. The woman picked up Mrs. Roewade's daughter and held her but put her down upon being told to do so by Mrs. Roewade. The witness stated that she had seen the same woman pick up other children on other occasions. Mrs. Roewade further testified that she had observed a man in the park who was playing with toy trucks and another man who was playing with a toy pistol. Still another man

played with Mrs. Roewade's children in the park. The witness felt that the incident was unusual because the man played with the children "on their level." In May, 1974, Mrs. Roewade observed a man walking past her home while swinging his arm wildly, shaking his head and yelling unintelligible words. On still another occasion, Mrs. Roewade found a woman near her home who stated that she did not know where she lived or what her name was. Mrs. Roewade took the woman by the hand and walked her to the Ridgeview House, and the woman then recognized the Ridgeview House as her residence.

The next witness was Francine Piehl, who lived only two buildings away from the Ridgeview House. In the summer of 1973, Mrs. Piehl was informed by her oldest son that a woman had picked up Mrs. Piehl's younger son in the park. Mrs. Piehl immediately went to the park and found her son, who said that he had to kick and bite the woman to get free from her. Mrs. Piehl then stayed in the park with her two children and observed a woman try to grab her son's arm. The witness tried to have a conversation with the woman but could not understand the woman's garbled speech. Mrs. Piehl stated that she reported this incident to the Ridgeview House. In the spring of 1974, Mrs. Piehl found a woman standing in her dining room. Mrs. Piehl tried to converse with the woman, but the woman did not speak English. The witness then escorted the woman out of the house, but the woman appeared a few minutes later and began pounding with her hands on Mrs. Piehl's window. Mrs. Piehl then called the Ridgeview House and was told that the woman would be taken care of. On the following day an employee of the Ridgeview House admitted to Mrs. Piehl that the woman in question was a resident of the Ridgeview House but assured her that the woman was harmless. On another occasion, a male resident of the Ridgeview House came to Mrs. Piehl's home and asked for a dime to make a phone call. The witness stated that she never called the police as a

result of these incidents but that she did feel endangered.

Marilyn Levy, another resident of the neighborhood, also testified about several incidents. She was informed by her youngest child that a woman had picked her up in the park and hugged her. The woman also put the child's shoes and socks on the child's feet. On another occasion, Mrs. Levy saw a man near her house waving his arms wildly in the air and shaking his head in a strange manner. She later saw the same man standing alone but speaking aloud in two distinct voices. He seemed to be having an argument with himself by using two voices. The witness saw the same man a third time walking down the street and observed the man as he entered the Ridgeview House. Mrs. Levy further testified that she once observed a man sitting on a bench asking two girls to help him and to give him money. The witness had previously seen that man standing in the doorway of the Ridgeview House. On still another occasion, Mrs. Levy observed a man whom she had seen go into the Ridgeview House in the past. The man was dressed in winter clothing even though it was a hot day, and Mrs. Levy heard the man say, "I'm a nut, I'm a nut."

The next witness was Ursula Mandelstam, a counselor and guidance worker who is in private practice. She visited the Ridgeview House on four occasions to see a patient of hers. During one of these visits, she was confronted by a man who asked her for money. At other times she saw residents of the Ridgeview House crying or speaking in an agitated manner. Mandelstam's patient complained to her about the food served at the Ridgeview House, that she was not always given her medication when she needed it, and that money had been stolen from her in the house.

Donna Brunger testified that she also lives near the Ridgeview House. In May, 1974, she saw a woman standing outside crying. Mrs. Brunger approached the woman, who then said that she was lost and that she was from the Ridgeview House but did not want to go back. Mrs. Brunger also stated that she once saw a man walking

in a very unsteady manner. The man crossed the street without checking for traffic and risked being hit by a car. The witness had previously seen that man standing in front of the Ridgeview House. Mrs. Brunger stated that she is frightened by the presence in the neighborhood of the Ridgeview House.

Susan Frolichstein, who lives about one block from the Ridgeview House, testified about two incidents in the neighborhood. On one occasion when she was walking past the Ridgeview House, she saw an elderly man pounding on the door of the house and moaning. At another time she saw a man who stood for about 10 minutes staring into the bushes in the witness' yard. The witness provided no testimony suggesting that the man involved was a resident of the Ridgeview House. Frolichstein also testified that she was frightened by the fact that the Ridgeview House was in the neighborhood.

Peter Jans, an alderman for the city of Evanston, testified that he was a member of the City Council Planning and Development Committee in 1970 when the committee considered the application of Ridgeview House, Inc., for a special use permit. Jans stated that his committee was informed by Bertram Miner and by John Porter, an attorney for Ridgeview House, Inc., that the Ridgeview House was going to be a home for the elderly and not a nursing home. Jans stated that Miner and Porter also represented that Ridgeview House would not be used to house people suffering from any mental condition. The witness admitted that Miner never specifically guaranteed that Ridgeview House would never have a resident who had ever been in a mental institution. Miner allegedly made a more general statement to the effect that there would not be any "mental persons" in the house. Jans testified that, as a result of the representations of Miner and Porter, condition 13 was added to the special use permit. According to Jans, condition 13 was intended to com- pletely prohibit former mental patients from residing at

the Ridgeview House. Jans testified that he originally drafted condition 13 to read that "A person suffering from mental retardation or mental disorders shall not be permitted to reside in the shelter care facility." The condition was changed so that it only applied to individuals who were apt to be a burden to other residents or to the surrounding neighborhood. Jans stated that the additional language was added as a compromise among members of the committee.

The final witness to testify was Richard Haigh, a businessman whose place of business was one block from the Ridgeview House. Haigh stated that on July 5, 1974, he observed a man leaning against a large plate glass window and pushing against the window. Haigh had seen this man going into and leaving the Ridgeview House. On another occasion, an elderly woman entered Haigh's office and asked for assistance in getting social security benefits. Haigh had informed the woman on four or five prior occasions that she was unable to get that assistance in his office. The woman stated that she was from the Ridgeview House. Haigh also told of an incident in which a man was almost hit by an automobile while crossing the street. Haigh said nothing to suggest that the man was a resident of the Ridgeview House. On another occasion a woman entered Haigh's office and asked for a job. Upon being told that no jobs were available, the woman began picking up papers and stated that she would do the filing. She then asked whether she could take a typewriter to the Ridgeview House in order to practice.

A tape recording of the hearing before the Zoning Board of Appeals on June 16, 1970, was admitted into evidence by stipulation. The first witness at that hearing was John Porter, an attorney for Ridgeview House, Inc. Porter testified that the Ridgeview House was to be a sheltered care facility that provides food, shelter and personal care to persons who require such care. Porter stated that the facility would not be providing nursing

care. He further implied that no person who was in need of mental treatment would be placed at the Ridgeview House. Porter informed the Zoning Board that Illinois statutory law provides that persons who have mental or emotional problems shall not be kept in a sheltered care home.

Miner, one of the organizers of the Ridgeview House, Inc., testified before the Zoning Board that mentally ill individuals would not be residing at the Ridgeview House. He also stated that the home was for old people who were somewhat debilitated by age.

After considering the above testimony, the court granted the defendants' motion for judgment in their favor. The plaintiff appeals from that order.

Several of the issues before this court are factual issues, the plaintiff arguing that the trial court's finding is contrary to the evidence. Before considering those issues, we wish to clarify the procedure that a reviewing court is to follow in reviewing a decision of a trial court granting a judgment in favor of the defendant. The plaintiff cites *Pedrick v. Peoria and Eastern R.R. Co.*, 37 Ill.2d 494, for the proposition that directed verdicts should be granted only in cases in which all the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors the movant that no contrary verdict could ever stand. *Pedrick* involved a trial before a jury, however, and is therefore significantly distinguished from the instant case. The *Pedrick* rule was designed to prevent a trial judge from assuming the duties of the trier of fact in a jury case. In a trial without a jury, however, the trial judge is the trier of fact, and the *Pedrick* rule is not applicable. In a case tried without a jury, the trial court is to weigh the evidence when a defendant moves for judgment at the close of the plaintiff's case. (Ill. Rev. Stat. 1973, ch. 110, par. 64(3).) In ruling on the defendant's motion for judgment, therefore, the judge had the duty to pass on the credibility of the witnesses and consider the weight and quality of the evidence. In weighing the evidence, the

court had the responsibility to consider all the evidence, including any favorable to the defendant. The court was not to consider the evidence in the light most favorable to the plaintiff. Consequently, we will not reverse the decision of the trial court unless that decision is contrary to the manifest weight of the evidence.

The plaintiff contends that condition 13 of Ordinance 60—0—70 should be interpreted to mean that individuals suffering from mental retardation or mental disorders shall not live at the Ridgeview House. The defendants have admitted that the Ridgeview House is occupied by some mentally retarded persons and former mental patients, but they assert that the plaintiff's interpretation of condition 13 is erroneous. We feel that the defendants must prevail on this issue. The language of condition 13 indicates that not all persons suffering from mental retardation or mental disorders were to be barred from the Ridgeview House, but only those who were apt to be a burden to other residents or to the neighborhood. The testimony of Jans is relevant to the issue. He stated that he originally drafted condition 13 so that it clearly provided that individuals suffering from mental retardation or mental disorders were not to live at the Ridgeview House. According to Jans, condition 13 was amended in a compromise among members of the City Council Planning and Development Committee. That testimony indicates that the committee did not intend condition 13 to be an absolute prohibition against mentally retarded individuals residing at the Ridgeview House.

The plaintiff also contends that the evidence proved that persons suffering from mental retardation or mental disorders were residing at Ridgeview House and were a burden to other residents and to the surrounding neighborhood. The plaintiff relies primarily on the testimony of the eight witnesses who lived in or did business in the neighborhood in question. These witnesses testified about numerous incidents allegedly involving residents of the Ridgeview House. Several of the incidents mentioned by

the plaintiff's witnesses involved individuals who may or may not have been from the Ridgeview House. The testimony with respect to most of the incidents was that the individual involved had been seen at or near or going into the Ridgeview House. The evidence concerning some of the incidents, however, provided no link between the individual involved and the sheltered care home. Even assuming that persons from the Ridgeview House were involved in each incident, the evidence concerning the burden placed on the community is not entirely in favor of the plaintiff. The testimony did establish that some people who acted very strangely did reside at the Ridgeview House. The defendants had admitted as much. However, with the possible exception of the woman who picked up children in the park, it was not shown that any resident of Ridgeview House posed any threat of violence to the community. The evidence does not establish whether the woman who picked up children in the park was dangerous or whether she was merely a person who liked children and who could not easily communicate.

The evidence did tend to establish that the defendants made substantial efforts to comply with condition 13 of Ordinance 60—0—70. Cohen testified that the Ridgeview House did not accept residents who were not educable or trainable. He was of the opinion that no people who were likely to be a burden on others were residing in the Ridgeview House. Also significant is the screening process that was used to determine whether a patient from the Department of Mental Health would be placed at the Ridgeview House. Representatives of the Department and of the Ridgeview House testified that individuals who had serious mental problems were not placed at Ridgeview. Only patients who were in a state of remission were discharged from the Department of Mental Health. We also deem significant the fact that a representative of the city was involved in this screening process until the time of the filing of this action. According to the testimony, no person

was accepted for residence if this representative voiced objection, and half of the applicants for residency were eliminated through the overall screening process. That fact is an indication that the defendants were attempting to comply with the ordinance. Of even more importance is the fact that residents of the Ridgeview House who did tend to become a burden on others were removed from the house. Dr. Wolfberg testified that he hospitalized residents if he detected symptoms of mental illness. Cohen stated that he had observed some residents who seemed to be a burden on others and that he arranged to have those residents placed in another facility. Several witnesses testified about the monitoring of former patients of the Department of Mental Health. That testimony tended to establish that the former mental patients were not merely forgotten after being placed at the Ridgeview House. Their progress was monitored so that it could be determined whether they belonged in a sheltered care facility. In light of the above evidence, we cannot find that the trial court erred in finding that Ridgeview House, Inc., had not violated condition 13 of Ordinance 60—0—70.

The plaintiff also alleges that injunctive relief should have been granted because the Ridgeview House has failed to maintain personnel sufficient in number or qualifications to properly care for the residents. The evidence introduced to support this contention is weak. The plaintiff relies primarily upon the testimony of William Taylor, a young man who had been employed at the Ridgeview House for less than a month. Taylor stated that he was aware of some errors that had been made in dispensing medicine at the Ridgeview House. The plaintiff also relies on a letter, attached to the complaint, that was sent to the Board of Directors of Ridgeview House, Inc., and signed by six employees of Ridgeview House. The letter alleges that residents of the Ridgeview House are neglected and not properly cared for. The plaintiff did not call any of the six co-signers of the letter to testify at trial.

Nor did the plaintiff introduce any evidence corroborating the allegations made in the letter. The plaintiff introduced no evidence suggesting that a larger or more qualified staff was necessary to operate the sheltered care facility. We therefore hold that the trial court did not err in ruling against the plaintiff with respect to the allegations concerning the staff or the quality of care at the Ridgeview House.

The plaintiff also contends that the Ridgeview House was being operated in violation of State law because it was licensed as a sheltered care home but was providing the services of a nursing home. Section 1 of "An Act in relation to the licensing and regulation of homes for the maintenance, care, or nursing of persons who are ill, aged or physically infirm" (Ill. Rev. Stat. 1973, ch. 111½, par. 35.16) defines a sheltered care home as follows:

> " 'Sheltered care home' means a county sheltered care home or a sheltered care home operated as part of a county nursing home pursuant to 'The County Home Act', approved April 11, 1967, or a private boarding home, institution, building, residence, or other place whether operated for profit or not which, through its ownership or management, provides sheltered care to 3 or more persons who are not related to the applicant or owner by blood or marriage, or any similar facility in which maintenance is provided to 3 or more persons who by reason of physical infirmity require personal care."

The same statute defines "personal care" in these terms:

> " 'Personal care' means assistance with meals, dressing, movement, bathing or other personal needs, or general supervision and oversight of the physical and mental well-being of an individual, exclusive of nursing, who, because of age, physical or mental disability, emotional or behavior disorder, or mental retardation is incapable of maintaining a private, independent residence or who is incapable of managing his person whether or not a conservator has been appointed for such individual."

The statute defines "nursing" as professional nursing or

practical nursing for "sick or infirm persons who are under the care and supervision of licensed medical practitioners." (Ill. Rev. Stat. 1973, ch. 111½, par. 35.16.) In arguing that the residents of the Ridgeview House have been receiving nursing care, the plaintiff relies on the testimony that registered nurses are on the staff at the Ridgeview House and that some of the residents of the house are mentally retarded or are former mental patients.

The fact that licensed nurses are employed at the Ridgeview House does not necessarily mean that the house is a nursing home. While the statute does not require the employment of professional nurses by sheltered care homes, it does not prohibit the practice. A proper function of a sheltered care home is to provide personal care to persons who require such care by physical infirmity. The statutory definition of "personal care" leads us to the conclusion that a sheltered care home may contain residents who are mentally retarded or mentally disabled or who have emotional or behavioral disorders. We will not find that Ridgeview House was being operated in violation of the State statute, therefore, merely because some of the residents were mentally retarded or were former mental patients. The plaintiff asserts that the Ridgeview House actually provided treatment for mental infirmities and was therefore something more than a sheltered care home. We cannot agree with that allegation, even though professional nurses were employed at the Ridgeview House and even though medication was given to some residents who were mentally retarded. The evidence suggests that residents at the Ridgeview House were not actually receiving treatment for their mental disorders. Dr. Desai testified that patients of the Department of Mental Health are not placed at the Ridgeview House unless they have recovered to a certain degree from their mental disorder. Only individuals who have the potential to adjust to the community are placed in a sheltered care home. Dr. Wolfberg did see many of the residents of the Ridgeview House, but it is implicit from

his testimony that he did not do so as a treating psychiatrist. His duties were to consult with the staff of the Ridgeview House, and he saw some residents so that he could consult with the staff with respect to those residents. When Dr. Wolfberg did observe symptoms of mental illness in a resident, he referred that individual to another facility for treatment. Miner testified that, while several mentally retarded persons do reside at Ridgeview House, mentally ill individuals who were still receiving treatment for their illness were not accepted by the Ridgeview House. Cohen also stated that mentally ill patients are not treated at the Ridgeview House and stated that Dr. Wolfberg was not a treating psychiatrist, but rather was a consulting psychiatrist. Dr. Saporta testified that some persons with various symptoms of mental illness are placed at the Ridgeview House. He also stated, however, that a person will not be placed in a sheltered care home if he is seriously mentally disturbed or if acute symptoms of illness are still present. He also said that a person must be in some stage of remission if he is to be placed in a sheltered care home. We do not agree with the plaintiff that the fact that the Department of Mental Health monitors its former patients who are in the Ridgeview House proves that the patients are receiving treatment for their mental illness. The trial court's finding that the operation of the Ridgeview House was not in violation of the State statute was not contrary to the manifest weight of the evidence. The plaintiff introduced no direct evidence that residents of the Ridgeview House were being treated for their mental illness. No evidence was introduced to explain the duties of the nurses on the staff at the Ridgeview House. We therefore hold that the court did not err in finding that the Ridgeview House was not being operated in violation of the State statute.

The plaintiff's final ground for asserting that injunctive relief should have been granted is that certain representatives of Ridgeview House, Inc., made false

statements which induced the Evanston city council to grant the special use permit. The plaintiff refers specifically to the testimony of Porter, Miner, and Arthur Saulk before the Zoning Board of Appeals. Porter had informed the Board that the Ridgeview House would not provide nursing care, that no person who requires mental treatment would be admitted to the home and that persons who have mental or emotional problems would not be admitted. Miner testified before the Board that no mentally ill persons would be residing at the Ridgeview House. He further stated that his intent was to provide care for elderly people who are somewhat debilitated. Saulk, an architect who was hired by Ridgeview House, Inc., to remodel the building, testified that the residents of the Ridgeview House would be healthy individuals who need a place to live.

The plaintiff argues that the above testimony led the city council to believe that the Ridgeview House was to be a home for the aged and would not accept mentally retarded individuals or former mental patients. The plaintiff therefore alleges that the defendants should be estopped from operating anything but a home for the aged.

Some of the statements made to the Zoning Board of Appeals did prove to be untrue. The plaintiff's evidence established that some residents of the Ridgeview House had exhibited very strange behavior and that some residents were mentally retarded or were former mental patients. The evidence did not establish, however, that Ridgeview House was providing nursing care or treatment for mental illness. The statements that Ridgeview House would not be a home for persons with mental or emotional problems and that the residents of the Ridgeview House would be healthy individuals did not prove to be true. If Miner's testimony is interpreted as an implication that Ridgeview House was to be merely a house for the aged, that testimony also proved to be untrue. Some of the

former mental patients placed at the Ridgeview House by the Department of Mental Health were young or middle-aged people. We therefore conclude that it is possible that the Evanston city council may have been misled by some of the statements made to the Zoning Board of Appeals. It does not necessarily follow from that conclusion, however, that the plaintiff is entitled to injunctive relief. The application for a special use permit clearly stated that the Ridgeview House was to be a sheltered care home. The definition of a sheltered care home is provided by statute, and we feel that the plaintiff should have been aware of the statute. It follows that the plaintiff should have realized that a sheltered care home is not merely a home for the aged and that such a home may have residents who suffer from mental retardation, mental disability or an emotional or behavioral disorder. If the city of Evanston wished to prohibit Ridgeview House from accepting this type of individual, it could have attempted to do so through a specific limitation to the special use permit. Condition 13 to Ordinance 60—0—70 did not prohibit Ridgeview House from accepting residents who were mentally retarded or who had some other type of mental disability. Condition 13 applied only to such persons whose mental retardation or mental disorders are "apt to make them a burden to the other residents or to the surrounding neighborhood." The testimony of Jans is that the above clause was added to condition 13 as a compromise among the members of his committee. That evidence indicates that the members of the committee realized that some persons who were afflicted with mental retardation or mental disorders could reside at the Ridgeview House. We therefore find that the trial court did not err in refusing to grant injunctive relief to the plaintiff.

In view of its holding that the plaintiff had failed to establish its case, the trial court had no need to address the constitutional issues presented by the defendant Department of Mental Health in its answer. However, the

trial court did see fit to reach the merits of those issues, and the parties have fully briefed and argued the constitutional questions before this court. Under these circumstances, we will consider the constitutional questions presented.

It is a fundamental principle of law that ordinances are presumptively valid, and the burden of demonstrating the invalidity of an ordinance rests upon the party attacking the ordinance. (*Exchange National Bank of Chicago v. County of Cook,* 25 Ill.2d 434; *La Salle National Bank v. City of Evanston,* 57 Ill.2d 415.) In order to overcome the presumption, "it must be established by clear and convincing evidence that the ordinance, as applied to [the challenging party], is arbitrary and unreasonable and has no substantial relation to the public health, safety or welfare." (*Exchange National Bank of Chicago v. County of Cook,* 25 Ill.2d 434, 440.) Moreover, we have noted that "local zoning authorities are vested with broad powers in determining the suitability of a given site for a proposed special or conditional use." *Pioneer Trust and Savings Bank v. County of Mc Henry,* 41 Ill.2d 77, 84.

Were we to accept the interpretation of condition 13 urged upon us by the plaintiff, we would entertain doubts regarding its constitutionality. However, as previously indicated, we read the condition as barring residence only by those individuals whose mental retardation or mental disorders are "apt to make them a burden to the other residents or to the surrounding neighborhood." Construed in this manner, condition 13 represents a reasonable accommodation of the interests of all parties concerned. In our judgment, the defendants have not sustained their burden of demonstrating that the restriction incorporated in the ordinance is arbitrary, unreasonable, and lacking substantial relation to the public health, safety or welfare.

The defendants have argued, and the trial court held,

that condition 13 is void because of its vagueness. It would unduly extend the length of this opinion to exhaustively treat this issue since we find that the trial court's determination, in this respect, is without foundation. An ordinance will be upheld despite attack on vagueness grounds "if the language used 'conveys sufficient definite warning as to the proscribed conduct when measured by common understanding and practices.' [Citations.]" (*City of Decatur v. Kushmer,* 43 Ill.2d 334, 336; *City of Chicago v. Lawrence,* 42 Ill.2d 461, 464.) Measured by this standard, condition 13 affords sufficient warning so as to guide those to whom it applies.

We have examined the remainder of defendants' constitutional arguments and conclude that all are lacking in merit. It follows that the trial court erred in judging condition 13 to be unconstitutional. Accordingly, we need not address the plaintiff's further contention that the defendant Ridgeview House, Inc., was estopped from challenging the constitutionality of condition 13. We reverse that portion of the trial court's judgment which held unconstitutional condition 13 of Ordinance 60—0—70. The judgment of the circuit court of Cook County is otherwise affirmed.

*Affirmed in part and reversed in part.*