LEWIS E. GIBSON *et al.*, Plaintiffs-Appellees, *v*. THE VILLAGE OF WILMETTE, Defendant-Appellant.

First District (4th Division)    No. 80-1400

Opinion filed June 25, 1981.

Robert J. Mangler, of Wilmette, for appellant.

Bernstein & Yalowitz, Ltd., of Chicago (Stephen S. Messutta, of counsel), for appellees.

Mr. PRESIDING JUSTICE ROMITI delivered the opinion of the court:

A recently passed village of Wilmette ordinance prohibits the separation of ownership of legally separate but adjoining lots of record where

the individual lot would be less than the minimum permissible area or frontage size. The issue in this case is whether that ordinance is valid as applied to property purchased before the passage of the ordinance where the lots as separated would be the same size as all of the surrounding lots and there was no showing that anyone would be damaged by the fact that the lot upon which plaintiffs wished to build was below the minimum size required by ordinance. The plaintiffs filed a declaratory judgment action alleging in count I that the ordinance was unconstitutional and in count II that the defendant was estopped from asserting that the lot was not a buildable lot. The trial court denied plaintiffs' claim of estoppel but found that the ordinance was unconstitutional as applied to their lot. The defendant appealed; the plaintiffs did not cross-appeal. We affirm.

The lot in question is located on the northwestern corner of Isabella and Seventeenth Street in Wilmette. Isabella, an east-west street, divides Wilmette from Evanston. The lot extends 50 feet along Seventeenth Street and 127 feet along Isabella. Before 1978 it and the lot to the north, along Seventeenth Street (52' x 127'), were treated as one lot—a house was built on the northern lot, none on the corner lot. However, while the vacant lot before 1978 acted as a side yard, both it and the northern lot were lots of record. Likewise, until 1975 both were buildable lots under the city ordinance since they qualified under the grandfather clause.

In 1972 the plaintiffs bought the two lots. Before they made the purchase they inquired of the village as to whether the vacant lot was buildable, explaining that they were either going to buy the house or the house and the vacant lot as a package. They received both oral and written assurances that the vacant lot was buildable, as indeed it was in 1972.

In 1975 the following ordinance was adopted by the village:

"Where two or more adjoining lots shown in a plat properly recorded with the office of the County Recorder are held or become held in common ownership at any time, subsequent to the effective date of this ordinance, and the use of such adjoining lots as separate parcels would not meet the requirements of this ordinance, the ownership of said lots shall not be separated nor shall any of the lots be used in any way to conflict with the regulations of this ordinance. No building permits shall be issued for the use of any lot or portion of lot sold, transferred or conveyed in violation of the provisions of this section, provided, however, that this provision shall not prevent the dividing of presently existing townhouse and other multiple family dwellings into separate ownership units."

Other ordinances provided that the lot area should not be less than 8,400 square feet and the width not less than 60 feet. The front yard depth

should not be less than 25 feet, and the rear yard not less than 20 percent of the lot depth or 25 feet, whichever is greater, except that it need not be more than 40 feet. The total width of both side yards should be not less than 25 percent of the lot width; in no instance should the width of either side yard be less than 10 percent of the lot width or 4 feet, whichever is greater, nor need it be more than 15 feet. A side yard adjoining a street should not be less than 25 feet, except that the buildable lot width need not be reduced to less than 60 percent of the lot width. No changes were made in these requirements in 1975.

The buyer of the house contracted to buy the vacant lot on condition it was buildable, and contracted to resell it to a third party on the same condition. He did not want it as a side lot. The only offers the plaintiffs received for the vacant lot were based on its being buildable. In 1978 the plaintiffs sought a variation from the Zoning Board of Appeals. When this was denied, they filed this action for declaratory judgment.

The plaintiffs now live in Oak Park, 35 miles away from the Wilmette property. There is no one who can water or maintain the property for them although they are required to keep it up. They pay about $500 in taxes yearly on it. However, it can, under the ordinance, be used for nothing but open space. Even pitching a tent would be illegal.

The neighborhood is a fully developed north suburban community, consisting principally of middle-aged homes, owner occupied and well maintained. The subject site was the only vacant lot in the area.

The houses in the area are developed on sites with frontages ranging from 25 to 33 to 42 to 50 feet frontages; a few scattered sites are larger, perhaps up to 65 feet frontage. Specifically, on the west side of Seventeenth north of Isabella property lots are 50′ x 127′, the same as plaintiffs'; on the east side of Seventeenth north of Isabella they are 50′ x 126′. On the east half of the east block, the lots facing the street to the east (Central Park) are 130 feet deep and 25-33 feet wide. About 20 percent of these are double lots but typically they are individually developed. East of that block the lots are the same size. South of the property, in Evanston, the lots are typically smaller. About 250-300 feet southeast of the property the lots vary from 35 to 42 feet frontage.

On the other side of the alley immediately west of the vacant property, the frontage of the lots which face Lawndale, the street to the west, is 50 feet. They have a depth of 244 feet. The two lots immediately behind the vacant lot face Isabella and are 145′ x 81′ and 100′ x 81′. In Evanston the lots southwest of the subject property are 55 x 244 feet.

Most of the houses on the north side of Isabella are set back more than the minimum distance required. The house on the northwest corner of Isabella and Lawndale is set back 30 feet; and two houses west of the vacant lot are set back 25 feet and 37 feet. The house on the corner of

Isabella and Central Park is set back 35 feet. However, the house on the lot across from the vacant lot, on the northeast corner of Seventeenth and Isabella, is only set back 8 feet.

Donald Engel, an appraiser, testified for the plaintiffs at trial. He testified that the market value of the lot at the time of the trial was $38,000 if the lot were buildable. He was not able to reach a specific value conclusion if the lot were not buildable since he was not able to locate any transactions with which he could document sales of nonbuildable sites. In his opinion, it could have only speculative value to perhaps one of two types of buyer: either someone who might purchase the property at a receiver discount on the speculation that someday it might become buildable, or on the speculation that it might be marketed to the adjoining owner to be developed as an additional side yard. The lot's value as a speculation would be no more than 25 percent of its value if buildable; as a side yard, its value would be between 25-50 percent of its buildable value.

On cross-examination he testified that, depending on the type and configurations, a single-family home built nine feet to the south of the present home on the lot to the north would conceivably not have any effect on the existing home. It must be noted that it was the purchaser of the home to the north who purchased and resold the vacant lot on condition that it was buildable.

Behles, an architect, introduced drawings for a proposed house for the property. The house could be set 5 feet from the lot line to the north and 15 feet from the lot line on Isabella. He testified that his plan met all ordinance requirements except frontage and lot size. He agreed that if the house was built seven feet from the house to the north it could affect light and air. It appears from the evidence that the existing house was built four feet from its southern lot line.

Max Hoyt, director of Community Development for Wilmette, testified for the defense. He testified that the parcel was not suitable for development because it was an integral part of the adjacent house to the north. He also testified that if the proposed house were built six feet from the existing house (which of course would be illegal and was not contemplated by anyone) it would detract from the light and air, particularly if the proposed house was 2½ stories high. (In fact the proposed house was only two stories high and was 10 feet lower in height than the existing house to the north.) He also stated a foot more or less between the houses would not make a substantial difference in the amount of light the existing house would receive.

In answer to the court's questions, he admitted that the property was classified as single-family residential, but that he had no plans for the lot.

Heckman, an urban planning consultant, also testified for the village.

He indicated that typically a variation is not allowed if the variance is more than 10 percent as it is here. He claimed that the character of the area is centered on Isabella. All of the houses on the north side of Isabella except one are set back more than the minimum distance required, and this is a very clear and discernible characteristic of that portion of Isabella. He admitted however that the house on the northeast corner of Seventeenth and Isabella is only set back 8 feet and, furthermore, if the lot in question were 60 feet in width, one could still legally put a house within 15 feet of Isabella—thus destroying the nice even appearance the witness was concerned about.

He also testified that building the proposed house would have an effect not only on the residence to the north but also on the residence to the west, because if a new house were constructed, it would be 10-15 feet closer to the street, thus cutting off a substantial amount of light and air to that property. However, as already noted, he admitted that even if the lot were regulation size a house could still legally be put within 15 feet of Isabella. While the other two lots on the north side of Isabella between Seventeenth and Lawndale are considerably larger than the subject property, the lot immediately to its west is still smaller than that required by the zoning ordinance.

In answer to the court's question, Heckman stated that he did not know of any building use which would be consistent with the community—just some form of open space for recreational use.

■■ After hearing the evidence, the trial court ruled for the plaintiffs on count I, finding the ordinance was invalid and unreasonable as applied to the property. It ordered that the plaintiffs and their successors in title should have the right to use the property for single-family detached dwelling construction purposes that otherwise complied with the village zoning ordinances and regulations. The court found against the plaintiff and for the defendant on the estoppel claim alleged in count II. Only the village appealed. Since the plaintiff has not cross-appealed the court's finding that the village was not estopped to rely on the ordinance, that finding is final, and we have no jurisdiction to review it here. *Clodfelter v. Van Fossan* (1946), 394 Ill. 29, 67 N.E.2d 182; *In re Pieper* (1979), 79 Ill. App. 3d 835, 398 N.E.2d 868; *Mid-West National Bank v. Metcoff* (1974), 23 Ill. App. 3d 607, 319 N.E.2d 336; *De Phillips v. Mortgage Associates, Inc.* (1972), 8 Ill. App. 3d 759, 291 N.E.2d 329, *appeal denied* (1973), 53 Ill. 2d 605; *Swenson v. Wintercorn* (1968), 92 Ill. App. 2d 88, 234 N.E.2d 91, *appeal denied* (1968), 38 Ill. 2d 630.

■■ The sole issue before this court is whether the plaintiffs have overcome the presumption of validity attaching to the ordinance. To overcome this presumption, plaintiffs must show that the ordinance as applied to them was arbitrary, unreasonable and without substantial

relation to the public health, welfare or safety and thus unconstitutional. (*City of Evanston v. Ridgeview House, Inc.* (1976), 64 Ill. 2d 40, 349 N.E.2d 399; *Welch v. City of Evanston* (1978), 65 Ill. App. 3d 249, 382 N.E.2d 615.) The factors that the court will consider have been repeated time and time again (*Duggan v. County of Cook* (1975), 60 Ill. 2d 107, 324 N.E.2d 406; *La Salle National Bank v. County of Cook* (1957), 12 Ill. 2d 40, 145 N.E.2d 65; *Welch v. City of Evanston* (1978), 65 Ill. App. 3d 249, 382 N.E.2d 615), and need not be repeated here. In considering these factors, primary importance is to be given to whether the restrictions imposed on the property in question are in conformity with surrounding existing uses. *Amalgamated Trust & Savings Bank v. County of Cook* (1980), 82 Ill. App. 3d 370, 402 N.E.2d 719, *appeal denied* (1980), 81 Ill. 2d 588; *Welch v. City of Evanston* (1978), 65 Ill. App. 3d 249, 382 N.E.2d 615. ■■ Having reviewed the record in light of these factors, we conclude that the trial court did not err in ruling that the presumptive validity of the ordinance had been overcome. As stated in *Welch*, 65 Ill. App. 3d 249, 253, 382 N.E.2d 615, 618:

> "A contrary result would not be justified where the only corresponding benefit to the public is the enforcement of a minimum lot area restriction which is at odds with so many of the neighboring improvements. *Hyndiuk v. City of Chicago* (1973), 14 Ill. App. 3d 1057, 304 N.E.2d 6."

The existing uses and zoning of nearby properties support the plaintiffs' position. While the entire area is now zoned for minimum lot areas of 8,400 square feet, all of the lots in the area to the north, south and east are substandard—indeed, they are the same size as the vacant lot or smaller. The lots to the west are larger; however, nearly all have frontages less than the 60 feet required by ordinance. While many of these have the required area size, the property immediately to the west of the vacant property does not. The unreasonableness of the ordinance as applied to the plaintiffs is also supported by the fact that plaintiffs' land is the only undeveloped lot in the area (*Welch v. City of Evanston* (1978), 65 Ill. App. 3d 249, 382 N.E.2d 615), and the fact that if the two lots were developed as one, the resulting lot would be the only one on a lot as large as 102 feet wide in the immediate area except for the two lots on Isabella, both of which are only 81 feet deep.

It is undisputed that the value of the vacant lot is reduced if it is unbuildable. On the other hand, there was no real evidence that anyone would be damaged if the plaintiffs are allowed to build on an undersized lot. The only evidence produced by the defendant was:

(1) the light and air of the house to the north might be affected if a house were built, but since the plaintiffs are required to comply with the

side yard requirements, the effect would be no greater than if the lot were the proper size;

  (2) the "even pattern" along Isabella would be interrupted, but as admitted by the witness, the pattern could be interrupted even if the lot were regulation sized.

■■ Unlike many other zoning cases, the plaintiffs did not purchase the land with knowledge of the zoning restrictions they are now complaining of and at a price reflecting those restrictions. At the time they purchased the property it was a legally buildable lot. Plaintiffs did not buy until they had assurances from the defendant that it was a buildable lot and, as defendant was aware, would not have bought the lot without such assurance. The property was changed by ordinance from buildable to nonbuildable in 1975, although there is nothing in the record indicating some change in the neighborhood which mandated the change. As we stated in *Amalgamated Trust & Savings Bank v. County of Cook* (1980), 82 Ill. App. 3d 370, 402 N.E.2d 719, *appeal denied* (1980), 81 Ill. 2d 588, property owners who purchase property in reliance upon the zoning restrictions, as the plaintiffs did here, are entitled to rely upon the precept that the classification will not be changed unless the change is required for the public good.

The defendant relies on *Grobman v. City of Des Plaines* (1975), 59 Ill. 2d 588, 322 N.E.2d 443, *Galpin v. Village of River Forest* (1962), 26 Ill. 2d 515, 187 N.E.2d 233, *First National Bank v. City of Chicago* (1962), 25 Ill. 2d 366, 185 N.E.2d 181, and *Reitman v. Village of River Forest* (1956), 9 Ill. 2d 448, 137 N.E.2d 801. None of these cases are applicable to the facts here. In *First National Bank* the issue was not whether anything could be built on the lot but whether a six flat could be built on it. All of the property on the block conformed to the R-3 classification except for one nonconforming use, and neighbors testified that they had relied on the ordinance. The tract had been purchased with knowledge of the classification.

In *Galpin* the plaintiff, as in the present case, sought permission to build on a side lot. Unlike our case, however, the lot had never been a lot of record so the grandfather clause had never applied to it as it had to the present lot until 1975. There was no change in the ordinance in *Galpin*. Furthermore, as the court pointed out, the lots of River Forest were of more than average size. It could be characterized as an exclusive residential area in which there had been little or no change in use since the adoption of the 1922 ordinance which established the size requirement attacked by the plaintiff. Unlike the present case, the character and use of the property in the area generally conformed to the zoning.

In *Reitman*, it was clear that the proposed house would not conform to the neighboring houses which were located in a choice residential area.

Likewise, the neighboring lots were substantially larger in area and width than the plaintiff's lot. Unlike the present case, the plaintiffs in *Reitman* purchased the property after the enactment of the ordinance in 1922, and they did not prove any impairment of market value. In *Grobman*, the plaintiff also purchased the property after the enactment of the ordinance. The lot's frontage was less than half the average for the neighborhood, and there was testimony the aesthetics of the general neighborhood would be affected by squeezing a house on such a small lot.

For the foregoing reasons, the judgment of the trial court is affirmed.

Affirmed.

JOHNSON and JIGANTI, JJ., concur.