NO. 4-06-0512          Filed: 5-23-07

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| KATHERINE RICE, Individually and as | ) | Appeal from |
| Representative of the Estate of ANGELA | ) | Circuit Court of |
| WILLIS, Deceased, | ) | Sangamon County |
|      Plaintiffs-Appellees, | ) | No. 00L0023 |
|      v. | ) | |
| SHADY WHITE, TANIKA McCOOL, and | ) | |
| MICHELETTE HUGHES, | ) | |
|      Defendants-Appellants, | ) | |
|      and | ) | |
| MARENDA LATHAN, | ) | |
|      Defendant, | ) | |
| SHADY WHITE, TANIKA McCOOL, and | ) | |
| MICHELETTE HUGHES, | ) | |
|      Third-Party Plaintiffs, | ) | |
|      and | ) | Honorable |
| MEYUNTOE DAVIS, | ) | Robert J. Eggers, |
|      Third-Party Defendant. | ) | Judge Presiding. |

JUSTICE MYERSCOUGH delivered the opinion of the court:

On October 25, 2005, a jury entered a verdict in favor of plaintiffs, Katherine Rice, individually and as representative of the estate of her daughter, Angela Willis (hereinafter plaintiff), awarding her $700,000 for the wrongful death of Willis. Defendants Shady White, Tanika McCool, Michelette Hughes, and Marenda Lathan were found liable for Willis's death. White, McCool, Hughes, and Lathan were also found to be acting in concert to bring about Willis's death. Additionally, the jury apportioned liability among defendants White, McCool, Hughes, Lathan, and Meyuntoe Davis, a third-party defendant. Davis was

not a party the jury found to be acting in concert with White, McCool, Hughes, and Lathan. Neither Davis nor Lathan is a party to this appeal. On May 19, 2006, the trial court denied defendants' posttrial motions requesting a new trial or a judgment notwithstanding the verdict. Defendants appeal, arguing (1) the evidence does not support the jury's findings; (2) the trial court's allowance of plaintiff's amended complaint adding in-concert liability was not proper; and (3) in the alternative, defendants are severally liable for the $700,000 award of damages to plaintiff. We reverse.

## I. BACKGROUND

On January 15, 1999, defendants McCool, Hughes, and Lathan hosted a party at the home of White, McCool's mother. Prior to the party, McCool, Hughes, and Lathan distributed a flyer advertising the party that included the language "We will check for weapons." Willis attended the party and was killed when Meyuntoe Davis, another guest at the party, fired shots into a crowded living room and struck Willis in the forehead.

On January 19, 2000, plaintiff filed a petition alleging negligence on the part of defendants that resulted in Willis's death. Plaintiff's claim was filed pursuant to the Wrongful Death Act (740 ILCS 180/0.01 through 2.2 (West 2000)), the Premises Liability Act (740 ILCS 130/1 through 5 (West 2000)), and section 27-6 of the Probate Act of 1975 (755 ILCS

- 2 -

5/27-6 (West 2000)).

On July 10, 2002, the trial court granted defendants' motion for summary judgment on all claims. On June 14, 2003, this court affirmed the trial court's order of summary judgment on all counts except the voluntary undertaking of a duty. Rice v. White, No. 4-02-0646 (June 13, 2003) (unpublished order pursuant to Supreme Court Rule 23). This court found that defendants voluntarily undertook a duty "to prevent the entrance of weapons into their party." Rice, slip order at 14. However, this court denied defendants summary judgment because it found that an issue of fact remained as to whether defendants performed their undertaking negligently and whether that negligence was a proximate cause of the injury.

On October 24, 2005, the day of the jury trial, plaintiff moved to amend her complaint to allege in-concert liability of defendants White, Lathan, McCool, and Hughes. The amendment stated, "one or more of the defendants knew that the conduct of one or more of the other defendants was negligent. Despite this knowledge, one or more of the defendants gave one or more of the other defendants substantial assistance while engaged in the negligent conduct." The trial court granted the motion to amend over objection.

Plaintiff called each of the defendants as adverse witnesses in her case in chief. Defendant Hughes testified that

she, McCool, and Lathan hosted a party on "January 1, 1999," at the home of McCool's mother, Shady White. Hughes was then 18 years old. Hughes testified that she had made the flyer. Hughes testified that she, McCool, and Lathan printed between 100 and 200 flyers. Hughes said the women's plan was to hand them out to students at Southeast High School, which Hughes attended at that time.

The flyer read:

"I had a dream that Shammy (Hughes)[,] Rinnie (Lathan)[,] and Tanika was throwing another set!!!

211 South Paul; 9:00 p.m.- until ya'll think the party outside $3.00 at da [sic] door & Juice included

 Jan[.] 15th[,] 1999

(We will check for weapons)."

Hughes testified that she discussed including the language about checking for weapons with McCool and Lathan before deciding to put it on the flyer. Hughes said she and the other women did not discuss how they would check for weapons. She testified that she did not check anyone at the party for weapons. Hughes said no one asked her to check for weapons and that she had never been to a party where guests were checked for weapons.

Hughes said that the girls had seen language like this

- 4 -

on other flyers and that she included the language about checking for weapons on the flyer as "an afterthought." Hughes testified that she thought the language on other flyers was meant to prevent people from bringing weapons. Hughes said, "So, we thought that it would be a good idea for us to place this on our flyer as well."

Hughes said they were expecting all of the people at the party to be high school students. There were people at the party that night Hughes did not know. Hughes said that she was not concerned about people she did not know attending the party. Hughes said the girls did not discuss keeping people they did not know out of the party. Hughes said that there was someone at the front door the evening of the party collecting $3 from everyone. Hughes said that she was going in and out of the house during the party, as were other guests at the party.

Hughes testified that she knew the victim, Willis, but that she and Willis were not friends. Hughes said she did not know the shooter, Meyuntoe Davis, and had no idea he was coming to the party. Hughes testified that she had no reason to believe there were going to be any weapons at the party.

Defendant McCool testified that she hosted the party on January 15, 1999, at the home of her mother, White. McCool testified that she was not with Hughes when Hughes typed the flyer for the party. However, she testified that she saw the

flyer a few days before the party and agreed that the language about checking for weapons was acceptable.  McCool testified that she did not tell Hughes to remove the language from the flyer and that, in fact, some of the other language on the flyer was her idea.  She also testified that she thought the language about checking weapons was a good idea because she did not want people bringing weapons to the party.

However, McCool said that she did not think that someone actually bringing weapons to the party was a real possibility.  McCool testified that regardless of her belief that no one would actually bring weapons to the party, she intended to check for weapons because that is what the flyer said.  She said that she and the other girls did not have any discussion prior to the party regarding who would check for weapons or how they would check for weapons.  McCool said they never discussed what they would do if they found a weapon at the party.  McCool said the girls wanted people to believe that this party was a safe place to go and that is why they said they would check for weapons on the flyer.  McCool said that she did not have a discussion with the other girls before the party about checking for weapons because she thought by including the language on the flyer it would make people feel safer and discourage people from bringing a weapon to the party.  She said she thought it would scare people into not bringing weapons.

McCool testified guests began arriving at 8 p.m. McCool stated that she saw Lathan checking for weapons at the party; she also saw her mom, White, checking for weapons. McCool said White was patting down the guests' arms and down their backs and legs. McCool was unsure if White checked the guests' pockets. McCool was asked whether she testified at her deposition in 2002 that she could not recall if anyone other than herself was checking for weapons that night. McCool testified that she was unsure whether her memory of events would be better at trial in 2006 than it was in 2002 when she gave her sworn testimony in a deposition.

McCool testified she also checked for weapons by patting down guests' arms and legs. She testified that someone else at the party made the guests remove their jackets. However, McCool said some guests did not remove their jackets. McCool said she did not check for weapons the entire night. She estimated she checked for weapons approximately 30 minutes at the beginning of the party and for a little while during the middle of the party. McCool testified that she had no training on how to search a person for weapons. She testified that she watched her mom pat down people for weapons and "did what she did."

McCool said there were approximately 100 to 150 people in the house that night. Her mom was the only adult supervision other than some of her older cousins. McCool said the house was

crowded but that she and the other hosts never discussed refusing to allow any more people inside. She could not recall if she saw anyone go outside and then come back inside the house.

McCool said she had never met Davis before the shooting. McCool testified, however, that she did know the decedent, Willis. She said that Willis lived across the street from her and was at her house all the time. Despite spending so much time at her home, McCool said her and Willis were not friends. McCool said that she was jealous of Willis because "[Willis] thought my mom was hers." McCool said that Willis would "always come over and want to help her clean, just talk to her. She was just over there all the time." McCool said at one point she believed Willis liked one of her brothers. McCool said that she at no time had a plan with Davis to allow him to bring a gun into the party. McCool said she was aware now that Davis got into the party with a gun and it was the shots he fired from that gun at the party that killed Willis. McCool said she never tried to stop Davis from entering the party.

McCool testified that a fight broke out at the party. She said she was walking back and forth between the kitchen and dining room when she heard two boys arguing and saw a girl standing up on the couch. McCool testified that she said, "You all need to stop. This party is over." She said that someone else yelled, "Yeah[,] this party is over." She said she then

heard shots and just stood there. She said she was in shock at that point. She testified she eventually fell to the ground, and once she realized what was happening, she crawled into the kitchen. She said that people had kicked the kitchen door open and were leaving the house. However, McCool said she did not want to leave her house, so she went to the basement and waited with other people until it was quiet. She said that someone yelled, "A girl is shot." McCool said when she came back upstairs she saw a girl lying on the ground and a lot of blood. She said she was running to people's houses saying "Call an ambulance, please." She later realized that it was Willis who had been shot.

White, McCool's mother, testified that she gave her daughter permission to host a party at her house. She said the party was a going-away party for her son, Nathan White, who was leaving to attend Gateway. She said that he was already gone on January 15, 1999, because he had to go to Gateway a week earlier than expected. White said she did not talk to the other two girls about the party and that she did not place any conditions on her agreement to let them host the party at her house.

White said she first saw the flyers before the party and that was when she learned they were going to charge $3 to come to the party. She also saw the language about checking for weapons before the party. She agreed that she thought including

this language on the flyer was a good idea because she did not want anyone to have a gun at the party.

White said that she was the only adult supervising the party that night and that there were approximately 100 to 150 guests in her house. She did not place any restrictions on who could come into the party that night. She said she did not know several of the people at the party, but they were students who went to school with her children. She said she was never concerned about having a lot of guests that she did not know in her house.

White said she was at the front door collecting money that night. White said that two other doors went into her house. She said the other two doors were locked at the time so the only way for people to get in and out was through the front door. She said she checked some of the guests for weapons. However, at White's deposition on January 10, 2002, she said that she left McCool, Hughes, and Lathan in charge of checking for weapons. At trial, White agreed that is what she testified to in her deposition but said that she had shown the girls how to pat down a person for weapons by demonstrating on some of their guests. White testified that she had never received any training on how to conduct a pat-down search for weapons. She said she got the idea of how to check someone for weapons from television. White said that after guests paid, one of their hands was stamped and

- 10 -

then they were allowed to go in and out.  White said that, regardless of whether she knew the person, if he or she paid $3, she allowed that person to go inside the house.

White remembered the decedent, Willis, coming to the party that evening.  White testified that she knew Willis well because Willis spent a lot of time at her house.  She said Willis and her son Nathan were very close.  White said she did not let Willis in at first because she did not have $3, and White thought it would be unfair if she let Willis in without paying.  White said Willis went home, returned with $3, and went inside the house.

White said she did not remember Davis coming to the party that night.  She did not know him prior to the shooting.  She said that her house was crowded that night.  White said that had she known that weapons were going to be at the party, she would have cancelled it.

Plaintiff Rice testified that she was decedent Willis's mother.  She said that in 1991 she moved across the street from White.  She said that prior to the party she knew neither White nor her daughter, McCool, very well.  She did not know Hughes, Lathan, or Davis prior to the party.

Prior to January 15, 1999, Rice said she stopped at Save-A-Lot and sent Willis inside to get a pizza.  Rice said that when Willis returned to the car, she was holding one of the

flyers for the party.  Willis told her mom that McCool had given her the flyer.  Rice said she looked at the flyer and asked Willis questions about the flyer.  Finally, after Willis told her that White would be at the party to supervise, she gave Willis permission to attend the party.  Rice said the language about checking for weapons influenced her decision to let Willis attend the party.  She said that she thought it would be a safe place.  Rice estimated Willis went to the party around 11 p.m.  Rice said her daughter returned in five minutes to get money to get into the party, and Rice gave her $5.

Rice said she realized there was a problem when she heard a lot of screaming and gunshots.  She said she looked out the window and saw a "guy" in the middle of the street who was shooting at the house.  She called 9-1-1.  About 10 minutes later, a man arrived at her door and told her that her daughter, Angela Willis, had been shot in the head.  Rice headed toward the house because she wanted to see her daughter but a police officer stopped her in the street.  Rice said she had known the police officer for 20 years.  After that, Rice said things were chaotic outside.  Rice saw a police officer carry her 12-year-old daughter, Kathy, out of the house.  Kathy was covered in blood.  Rice said she had sent Kathy over to the party to get Willis for her because cars were blocking her driveway and she wanted to know who they belonged to so that she could ask the owners to

move them.  Willis was shot while her sister Kathy was present.

Rice said Willis was active in the church choir and youth group and that Willis would often come by to visit her mother at work.  Willis also helped take care of her younger siblings at home and helped with the housework.  Rice said Willis was attending the Lawrence Adult Center to earn high school credits.  Rice also remembered Willis going over to White's house to help White fix her hair.

Rice said that she believed that it would be White who would be checking for weapons at the party even though White's name was not on the flyer.  Rice said she could see White's front door from her house because they live directly across the street from one another.  Rice said she saw White at the door that night collecting the cover charge.  She did not see anyone checking for weapons.

Michelle Hudson testified that she attended the party at White's house on January 15, 1999.  She said she was 16 or 17 years old at the time.  Hudson said she learned of the party from her cousin, Kamiera Robinson, who showed her the flyer.  Hudson said she was not surprised to see the language about checking for weapons on the flyer.  Hudson stated, "Everybody who has a party probably would put that on there."  Hudson and McCool were also friends at the time.  Hudson also knew Hughes and Lathan.  Hudson said that no one checked her for weapons and she did not see

anyone at all checking for weapons. Hudson testified at trial that the fact she was not searched for a weapon concerned her. However, at Hudson's discovery deposition taken in March 2004, Hudson said that the fact she was not checked for a weapon did not concern her. She testified that the court reporter got the question wrong. She said she had meant to correct her deposition but did not know how.

Hudson said she saw Willis and Davis at the party prior to the shooting. She said that between 30 and 60 minutes before the shooting occurred she saw that Davis had a gun, but she did not tell anyone. Hudson said Davis was in the living room when she saw the gun and that she was "pretty sure" other people saw the gun too. Hudson was not sure if anyone told White about the gun. Hudson did not leave the party after she saw Davis with a gun. She said she stayed and "gathered her people together."

Rice's daughter Kathy testified at trial that she had been at the party. Kathy was 12 years old at the time and went over to the party sometime after Willis had already gone over to the party. Kathy testified that her mother sent her over to the house to get Willis. However, in her deposition she denied that her mother had sent her over to White's house that evening. Kathy testified she told White, who was at the door when she arrived, that she was just going in to get her sister. Kathy did not pay to get inside the house. Kathy said as she proceeded to

go into the house, she saw her sister. Kathy testified she then went upstairs to use the bathroom. Kathy saw Davis upstairs with a gun. She did not know Davis before that night. Kathy said Davis told her to be quiet. She then headed back down the stairs to go home. Kathy testified she saw "flashing lights" and people were running. Kathy said when she saw the flashing, she heard gunshots. She said she ran toward the back door, which had been kicked open. She said that people were in the streets screaming, but she did not know why. Kathy said she went back to the front door, but as she was trying to go in, someone tried, but failed, to stop her from going inside. Kathy then saw that it was her sister lying on the floor. Kathy testified that she saw her sister in the kitchen area and that she got on her knees and started kissing her. Kathy said her sister did not respond other than taking a really deep breath.

James Young testified that he had been a police officer in the City of Springfield for 19 years at the time of trial. He said in 1999 his position in the Springfield police department was a crime scene technician. His job entailed locating and identifying physical evidence at a crime scene, photographing the scene, shooting video, recording measurements, creating diagrams, creating sketches, and generally preserving evidence.

Young was called to the scene at approximately midnight on January 15, 1999. Young testified that when he arrived,

- 15 -

police on the scene had already photographed the scene and videotaped it. He was instructed to draw a diagram of the floor plan of White's house. Young's diagram was entered as exhibit No. 2. Young said he included two bullet holes in the diagram that were found in the home. Young could not recall finding any shell casings in the home. He did not diagram where Willis's body was found. However, Young did recall recovering a gun on a small landing inside the house. The gun was represented on the diagram by the numeric 1. The gun found was a Smith & Wesson 9 millimeter. Young testified that he did not know where the gun came from, nor did he know whose gun it was. Young did not know what kind of gun Davis used the night of the party. Young said he did not fingerprint the gun, nor did he know whether it was ever examined for fingerprints. Young also did not know whether the bullet casings found in the home that night matched the Smith & Wesson 9 millimeter gun. He said that information would have been handled by the Illinois State Police. The parties stipulated at the close of evidence that Davis shot Angela Willis with a .357 Magnum pistol the night of the party.

Kamiera Robinson testified that she attended the party at White's house on January 15, 1999. Robinson was 15 years old at the time. Robinson said she had known McCool, Hughes, and Lathan since she was little. Robinson testified that prior to the party she had seen the girls' flyer. She said she had seen

the flyer at a city basketball tournament at the Prairie Capitol Convention Center.  Robinson said White was at the door when she arrived at the party and that White took her money but did not check her for weapons.  However, Robinson recalled that someone else checked her for weapons.  Robinson could not remember who it was that checked her.  However, in Robinson's deposition she testified that no one checked her for weapons that night.  Robinson said she saw Willis at the party and that she was talking to Willis when she was shot.  Robinson said that Willis initially fell onto her after being shot.

After the conclusion of plaintiff's evidence, defense counsel moved for a directed verdict.  Defense counsel argued that plaintiff had failed to establish negligence on the part of defendants and had not established proximate causation as a result of defendants' conduct.  The trial court denied the motion.  Plaintiff argued that the testimony from Hughes that she did not check for weapons at all and McCool's testimony, that she only checked for weapons the first 30 minutes and for a short while later that evening, was sufficient evidence defendants breached their duty.  Plaintiff argued to the court, "It was a gun, actually two guns, but one in particular, was carried into that party, and the decedent was shot, and we have--we believe there's enough evidence to go to the jury on this."  The trial court denied defendants' motion.  Defendants renewed their motion

- 17 -

at the close of all evidence, and the court again denied their motion.

Next, plaintiffs moved the trial court to rule that defendants were subject to in-concert liability as a matter of law. The court denied the motion and stated it was a question of fact that would be submitted to the jury.

Although the recitation of the jury instructions was not transcribed by the court reporter, the common-law record and jury instruction conference reflect that the following instructions were given to the jury as submitted by defendants:

"When I use the word 'negligence' in these instructions, I mean the failure to do something which a reasonably careful person would do, *** under circumstances similar to those shown by the evidence. The law does not say how a reasonably careful person would act under those circumstances. That is for you to decide." Illinois Pattern Jury Instructions, Civil, No. 10.01 (1995) (hereinafter IPI Civil (1995)).

"When I use the words 'ordinary care,' I mean the care a reasonably careful person would use under circumstances similar to those shown by the evidence. The law does

- 18 -

not say how a reasonably careful person would act under those circumstances.  That is for you to decide."  IPI Civil (1995) No. 10.02.

"When I use the expression 'proximate cause,' I mean that cause which, in natural or probable sequence, produced the injury complained of.  It need not be the only cause, nor the last or nearest cause.  It is sufficient if it concurs with some other cause acting at the same time, which in combination with it, causes the injury." IPI Civil (1995) No. 15.01.

"The plaintiff claims that she was injured and sustained damage and that the defendants were negligent in one or more of the following respects:

Marenda Lathan negligently failed to exercise reasonable and ordinary care for the safety of the persons attending the party when she allowed Meyuntoe Davis to enter the party with a loaded weapon.

Tanika McCool negligently failed to exercise reasonable and ordinary care for the safety of the persons attending the party

when she allowed Meyuntoe Davis to enter the party with a loaded weapon.

Shady White negligently failed to exercise reasonable and ordinary care for the safety of the persons attending the party when she allowed Meyuntoe Davis to enter the party with a loaded weapon.

Michelette Hughes negligently failed to exercise reasonable and ordinary care for the safety of the persons attending the party when she allowed Meyuntoe Davis to enter the party with a loaded weapon.

The plaintiff further claims that one or more of the foregoing was a proximate cause of her injuries.

Marenda Lathan denies that she did any of the things claimed by the plaintiff, denies that she was negligent in doing any of the things claimed by the plaintiff and denies that any claimed act or omission on the part of the defendant was a proximate cause of the plaintiff's claimed injuries.

Tanika McCool denies that she did any of the things claimed by the plaintiff, denies

that she was negligent in doing any of the things claimed by the plaintiff and denies that any claimed act or omission on the part of the defendant was a proximate cause of the plaintiff's claimed injuries.

Shady White denies that she did any of the things claimed by the plaintiff, denies that she was negligent in doing any of the things claimed by the plaintiff and denies that any claimed act or omission on the part of the defendant was a proximate cause of the plaintiff's claimed injuries.

Michelette Hughes denies that she did any of the things claimed by the plaintiff, denies that she was negligent in doing any of the things claimed by the plaintiff and denies that any claimed act or omission on the part of the defendant was a proximate cause of the plaintiff's claimed injuries.

The defendants further deny that the plaintiff sustained damages to the extent claimed."

See IPI Civil (1995) No. 20.01.

"The plaintiff has the burden of proving

each of the following propositions [as to each defendant]:

First, that the defendant acted or failed to act in one of the ways claimed by the plaintiff as stated to you in these instructions and that in so acting, or failing to act, the defendant was negligent;

Second, that the plaintiff was injured;

Third, that the negligence of the defendant was a proximate cause of the injury to the plaintiff.

You are to consider these propositions as to each defendant separately." IPI Civil (1995) No. B21.02.01.

Plaintiff tendered the following instructions:

"It was the duty of defendants, before and at the time of the occurrence to use ordinary care for the safety of Angela Willis.  This means that it was the duty of defendants to be free from negligence."

See IPI Civil (1995) No. 10.04.

"One who voluntarily undertakes to render services to another is subject to liability for bodily harm caused to the other

- 22 -

by one's failure to exercise due care in the performance of the undertaking."

The jury awarded $700,000 to the victim's estate and found defendants White, McCool, Lathan, and Hughes acted in concert in bringing about Willis's death. The jury attributed fault to defendants in the following proportions:

| | |
|---|---|
| Shady White | 19% |
| Maranda Lathan | 2% |
| Tanika McCool | 2% |
| Michelette Hughes | 2% |
| Meyuntoe Davis (third party) | 75% |

Several posttrial motions were filed. On May 19, 2006, the trial court heard these motions, including a motion under section 2-1202(b) of the Code of Civil Procedure (735 ILCS 5/2-1202(b) (West 2004)) requesting the court set aside the jury verdict. The court, without comment, denied all defendants' posttrial motions. This appeal followed.

## II. ANALYSIS

On appeal, defendants raise three issues: (1) whether the evidence at trial supports the jury's findings, (2) whether the trial court erred in allowing defendants to amend their complaint to add an allegation of in-concert liability, and (3) whether defendants are jointly and severally liable for the

damages. Because we find defendants prevail on the first issue regarding sufficiency of the evidence, we decline to address the remaining issues.

A. Effect of This Court's Prior Rule 23 in This Case

This case was before this court on appeal in 2002. According to the law-of-the-case doctrine, a determination of a question of law will generally be held to be binding throughout the subsequent stages of the case when the issue decided has been made on a prior appeal to a court of last resort. People v. Lyles, 208 Ill. App. 3d 370, 376, 567 N.E.2d 396, 400 (1990) ("'[A]n appellate court's determination on a legal issue is binding on both the trial court on remand and appellate court on a subsequent appeal given the same case and substantially the same facts.' [Citation.]").

"Generally, the law[-]of[-]the[-]case doctrine bars relitigation of an issue previously decided in the same case." Krautsack v. Anderson, 223 Ill. 2d 541, 552, 861 N.E.2d 633, 642, (2006), citing People v. Tenner, 206 Ill. 2d 381, 395, 794 N.E.238, 247 (2002). "'[T]he determination of a question of law by the [a]ppellate [c]ourt on the first appeal may, as a general rule, be binding upon it on the second appeal.'" Krautsack, 223 Ill. 2d at 552, 861 N.E.2d at 642, quoting Zerulla v. Supreme Lodge Order of Mutual Protection, 223 Ill. 518, 520, 79 N.E. 160, 161 (1906).

- 24 -

Illinois recognizes two exceptions to this doctrine: (1) when the supreme court, following the first appeal, makes a contrary ruling on the precise issue of law on which the appellate court based its former opinion; or (2) when the appellate court finds that its prior decision is palpably erroneous, but only when the court remanded the case for a new trial on all of the issues." Lyles, 208 Ill. App. 3d at 376, 567 N.E.2d at 400, citing Stallman v. Youngquist, 152 Ill. App. 3d 683, 689, 504 N.E.2d 920, 923-24 (1987), rev'd on other grounds, 125 Ill. 2d 267, 531 N.E.2d 355 (1988). Neither exception applies in this case. Therefore, our order remains binding on the parties in this case.

## B. The Trial Court Erred in Failing To Grant Defendants' Motion for a Directed Verdict at the Close of Plaintiff's Evidence

At the close of plaintiff's evidence, defendants moved for a directed verdict, arguing that plaintiff had not established negligence on the part of White, McCool, or Hughes. Defendants continue to argue on appeal that plaintiff failed to introduce evidence that satisfied the burden of proving by a preponderance of the evidence that any of the defendants acted negligently. Redmond v. Socha, 216 Ill. 2d 622, 646, 837 N.E.2d 883, 897 (2005) (plaintiff bears the burden of proving every necessary element of her negligence case by a preponderance of the evidence).

In support of their motion for a directed verdict,

defendants argued that plaintiff's evidence had also failed to establish that defendants' conduct was the proximate cause of decedent's injury.  In response, plaintiff argued to the court, "It was a gun, actually two guns, but one in particular, was carried into that party, and the decedent was shot, and we have-- we believe there's enough evidence to go to the jury on this." The trial court denied defendants' motion.  Defendants renewed their motion at the close of all evidence and the court again denied their motion.

"[V]erdicts ought to be directed and judgments n.o.v. entered only in those cases in which all of the evidence, when viewed in its aspect most favorable to the opponent, so overwhelmingly favors [the] movant that no contrary verdict based on that evidence could ever stand."  Pedrick v. Peoria & Eastern R.R. Co., 37 Ill. 2d 494, 510, 229 N.E.2d 504, 513-14 (1967); see also City of Evanston v. Ridgeview House, Inc., 64 Ill. 2d 40, 57, 349 N.E.2d 399, 407-08 (1976) (noting that the standard in Pedrick only applies in jury-tried cases).  The standard of review when the trial court denies a directed verdict is de novo. City of Mattoon v. Mentzer, 282 Ill. App. 3d 628, 633, 668 N.E.2d 601, 604 (1996).

The plaintiff bore the burden of presenting evidence at trial to support every element of her claim of negligence.  Old Second National Bank of Aurora v. Aurora Township, 156 Ill. App.

3d 62, 65, 509 N.E.2d 692, 695 (1987) (essential elements of recovery under the Wrongful Death Act includes a duty, a breach of that duty, and damages that resulted from defendants' breach). Even when examining the evidence in a light most favorable to plaintiff, we find the trial court erred when it denied defendants' motion for a directed verdict.

### 1. Defendants Voluntarily Undertook a Duty To Check for Weapons

The supreme court has recognized:

"'It is axiomatic that every person owes to all others a duty to exercise ordinary care to guard against injury which naturally flows as a reasonably probable and foreseeable consequence of his act, and that such duty does not depend upon contract, privity of interest[,] or the proximity of relationship, but extends to remote and unknown persons.'" Frye v. Medicare-Glaser Corp., 153 Ill. 2d 26, 32, 605 N.E.2d 557, 560 (1992), quoting Nelson v. Union Wire Rope Corp., 31 Ill. 2d 69, 86, 199 N.E.2d 769, 779 (1964).

However, there is no general duty to protect against the criminal acts of third persons. Jackson v. Shell Oil Co., 272 Ill. App. 3d 542, 547, 650 N.E.2d 652, 655 (1995). An exception to this rule will only be made if there exists (1) a

special relationship between the parties, and (2) the criminal act was reasonably foreseeable. <u>Jackson</u>, 272 Ill. App. 3d at 542, 650 N.E.2d at 655.

On appeal in 2002, we held that no special relationship existed between the parties to this case and affirmed the trial court's grant of the summary judgment motion in favor of defendants on that point. <u>Rice</u>, slip order at 9-14. However, citing <u>Wakulich v. Mraz</u>, 203 Ill. 2d 223, 245-46, 785 N.E.2d 843, 856 (2003), and interpreting all of the evidence in plaintiff's favor, as required in reviewing a ruling on defendants' motion for summary judgment, this court went on to find that defendants had voluntarily undertaken "a duty to prevent the entrance of weapons into their party." <u>Rice</u>, slip order at 14. In <u>Wakulich</u>, the supreme court held that the defendants had voluntarily undertaken a duty to care for decedent although the defendants and decedent shared no special relationship. In <u>Wakulich</u>, the defendants had taken charge of a young girl who had become intoxicated at their home. More than merely allowing her to "sleep it off," the defendants in that case moved decedent to another room, removed her vomit-stained blouse, and propped a pillow under her head to prevent aspiration. The defendants in <u>Wakulich</u> also prevented other persons from intervening in the care of decedent. The defendants in <u>Wakulich</u> eventually removed decedent from their home while she was still unconscious, and she

later died.  The supreme court held that the defendants' affirmative acts of caring for decedent after she became unconscious imposed a duty to use reasonable care.  Wakulich, 203 Ill. 2d at 245-46, 785 N.E.2d at 856.  The court in Wakulich said that the defendants' liability was not contingent on their relationship with decedent for purposes of the voluntary-undertaking count of the plaintiff's claim.  Wakulich, 203 Ill. 2d at 242, 785 N.E.2d at 854.  The court found that this holding did not circumvent the rule requiring a special relationship between the parties before imposing a duty because the defendants' liability arose by virtue of "their voluntary assumption of a duty to care for [decedent] after she became unconscious, irrespective of the circumstances leading up to that point."  Wakulich, 203 Ill. 2d at 242, 785 N.E.2d at 854.

Even though defendants' duty herein was defined by this court in the Rule 23 order issued on appeal of this case in 2002, the duty instructions given at trial were not an accurate reflection of that duty.  The jury was instructed as follows:

> "It was the duty of defendants, before and at
> the time of the occurrence to use ordinary
> care for the safety of Angela Willis.  This
> means that it was the duty of defendants to
> be free from negligence."

See IPI Civil (1995) No. 10.04.

- 29 -

This instruction, proffered by plaintiff, embodies a general negligence claim. Defendants' voluntarily assumed duty in this case was to check the entrants to the party for weapons. This instruction, however, significantly broadens defendants' duty to one of ordinary care appropriate only in a general negligence claim, not a negligence claim based on the voluntary assumption of a duty.

After this court found that defendants owed a duty to decedent under Wakulich, this court reversed the trial court's grant of summary judgment in favor of defendants because we found a material issue of fact remained regarding whether defendants negligently carried out their voluntarily assumed duty to check for weapons and whether defendants' negligence was the proximate cause of decedent's injury. Rice, slip order at 17.

### 2. No Evidence Showed Defendants Breached Their Duty to Check for Weapons

To establish a prima facie case for negligence, plaintiff must put forth evidence that defendants breached their duty owed to the plaintiff. Old Second National Bank of Aurora, 156 Ill. App. 3d at 65, 509 N.E.2d at 695. A defendant breaches her duty when she deviates from the applicable standard of care. Calles v. Scripto-Tokai Corp., 224 Ill. 2d 247, 270, 864 N.E.2d 249, 263 (2007) (common-law negligence requires plaintiff to establish the existence of a duty of care owned by the defendant, a breach of that duty, an injury proximately caused by the

- 30 -

defendant's breach, and damages).  Failure to exercise due care in the performance of a voluntarily assumed duty generally results in the imposition of tort liability on the party that has assumed such a duty.  Cross v. Wells Fargo Alarm Services, 82 Ill. 2d 313, 412 N.E.2d 472 (1980).  However, a voluntary duty is limited to the extent of the undertaking.  Wakulich, 203 Ill. 2d at 241, 785 N.E.2d at 854; Torres v. City of Chicago, 352 Ill. App. 3d 533, 535, 816 N.E.2d 816, 818 (2004) (noting that the court in Wakulich adopted section 323 of the Restatement (Second) of Torts).

Illinois relies on section 323 of the Restatement (Second) of Torts to assess when a breach of a voluntary undertaking has occurred.  LM ex rel. KM v. United States, 344 F.3d 695, 701 (7th Cir. 2003) (noting Illinois has adopted sections 323 and 324 of the Restatement (Second) of Torts); Torres, 352 Ill. App. 3d at 535, 816 N.E.2d at 818 (noting the supreme court adopted section 323 of the Restatement in Wakulich).  Section 323, titled "Negligent Performance of Undertaking to Render Services," establishes liability for failure to exercise reasonable care to perform an undertaking if (1) a party undertakes to do something and then fails to exercise reasonable care in a way that increases a third party's risk of harm; or (2) the harm is suffered because of the other's reliance upon the undertaking.  Comment b to section 323 of the

Restatement provides:

> "One who *** renders gratuitous services to [another], is not subject to liability to [her] for failure to have the competence or to exercise the skill normally required of persons doing such acts, if the other who accepts the services is aware, through information given by the actor or otherwise, of [her] incompetence." Restatement (Second) of Torts §323, Comment b, at 135-36 (1965).

On appeal in 2002, this court held that this standard, outlined in Comment b of the Restatement, was the correct standard but a material issue of fact remained whether defendants breached this standard. Rice, slip order at 16. Since defendants' undertaking was to check for weapons, the question of fact was whether they failed to carry out that undertaking with such competence and skill as each defendant possessed and, if not, whether decedent was aware of her incompetence. See Restatement (Second) of Torts §323, Comment b, at 136 (1965).

The evidence reflected that none of the defendants were particularly adept at checking for weapons. White testified that the extent of her knowledge on how to conduct a pat-down search came from television and that she demonstrated how to conduct a pat-down search to the other three defendants. More important,

no evidence suggests how defendants deviated from the applicable standard of care.

Absent evidence defendants breached their voluntarily assumed duty, this court must reverse, even in the face of such an egregious loss and Davis's criminal act.

3. <u>Jury</u> <u>Instructions</u> <u>Did</u> <u>Not</u> <u>Properly</u> <u>State</u> <u>Standard</u> <u>of</u> <u>Care</u>

Further, the jury instructions regarding standard of care given in this case were erroneous and require reversal.  The jury instructions regarding the applicable standard of care were overwhelmingly confusing in this case.  The following jury instructions, all of which were given, described the standard of care the jury should apply in this case:

"When I use the word 'negligence' in these instructions, I mean the failure to do something which a reasonably careful person would do, *** under circumstances similar to those shown by the evidence.  The law does not say how a reasonably careful person would act under those circumstances.  That is for you to decide."  IPI Civil (1995) No. 10.01.

"When I use the words 'ordinary care,' I mean the care a reasonably careful person would use under circumstances similar to those shown by the evidence.  The law does

- 33 -

not say how a reasonably careful person would act under those circumstances. That is for you to decide." IPI Civil (1995) No. 10.02.

"The plaintiff has the burden of proving each of the following propositions [as to each defendant]:

First, that the defendant acted or failed to act in one of the ways claimed by the plaintiff as stated to you in these instructions and that in so acting, or failing to act, the defendant was negligent." IPI Civil (1995) No. B21.02.01.

"One who voluntarily undertakes to render services to another is subject to liability for bodily harm caused to the other by one's failure to exercise due care in the performance of the undertaking."

The jury was also instructed that the issue in this case was whether:

"[Each defendant] negligently failed to exercise reasonable and ordinary care for the safety of the persons attending the party when she allowed Meyuntoe Davis to enter the party with a loaded weapon." IPI Civil (1995)

- 34 -

No. 20.01.

We note that the apparent confusion regarding the applicable standard of care may be due, in part, to the fact that moments before opening statements were to begin, the trial court granted plaintiff's motion to amend her complaint. The amendment alleged that defendants were subject to in-concert liability. This amendment alleged an entirely new theory of liability that had never been raised by plaintiff in earlier pleadings. However, even despite the myriad of jury instructions relating to the standard of care in this case, not one instruction accurately states the applicable standard.

The standard of care must be limited to the extent of defendants' undertaking. Their undertaking was not generally for the safety of the persons at the party, as the jury was instructed. Their undertaking was not to prevent Davis from entering the party with a loaded weapon, as the jury was instructed. Their undertaking was to check for weapons, and the question for the jury was whether they failed to carry out that undertaking with reasonable care. Since there was a complete absence of evidence regarding this standard, no reasonable juror could have found defendants to have breached their duty to use reasonable care.

4. No Evidence Was Presented To Establish Defendants' Acts Were the Proximate Cause of Decedent's Injuries

In addition to evidence that each defendant breached

her duty to the plaintiff, to establish a prima facie case of negligence, plaintiff must establish that defendants' breach was the proximate cause of decedent's injury. Calles, 224 Ill. 2d at 270, 864 N.E.2d at 263. Proximate cause includes both cause in fact and legal cause. First Springfield Bank & Trust v. Galman, 188 Ill. 2d 252, 257-58, 720 N.E.2d 1068, 1072 (1999). Cause in fact exists where there is a reasonable certainty that a defendant's acts caused the injury or damage. Mann v. Producer's Chemical Co., 356 Ill. App. 3d 967, 972-73, 827 N.E.2d 883, 887-88 (2005) (holding that the plaintiff must demonstrate as part of her prima facie case proximate cause by showing that decedent relied on the defendant's voluntarily assumed duty in his decision to cross the street). Proximate cause is usually a question of fact; however, a court may determine lack of proximate cause as a matter of law where the facts alleged do not sufficiently establish both cause in fact and legal cause. Rogers v. Reagan, 355 Ill. App. 3d 527, 532, 823 N.E.2d 1016, 1019-20 (2005).

On appeal in 2002, this court stated, "One who undertakes to render services to another is liable for physical harm resulting from the other's reliance on the undertaking." Rice, slip order at 15, citing Wakulich, 203 Ill. 2d at 242-43, 785 N.E.2d at 855, and Restatement (Second) of Torts §323, at 135 (1965). In that Rule 23 order, this court said:

- 36 -

"A reasonable jury could conclude the purpose of the warning was to increase attendance, and, consequently, some guests at the party, including decedent attended in reliance upon defendants' promise to restrict the entry of weapons." Rice, slip order at 15. Plaintiff's allegation in the amended complaint states: "[Defendants] owed a duty of reasonable care under the circumstances regarding the state of the premises or acts done or omitted on them to confiscate and restrict the entry of and use thereon of any and all weapons. *** Defendants carelessly and negligently failed to exercise reasonable and ordinary care of the safety of the persons attending the party when they allowed Meyuntoe Luva Davis to enter the party with a loaded weapons, after voluntarily undertaking the duty to check for weapons as advertised on the party fliers."

Under a voluntary undertaking theory, to establish proximate cause of the injury, the cause-in-fact component requires a showing that a plaintiff relied on the defendant's conduct. Restatement (Second) of Torts §323(b), at 135 (1965); Mann, 356 Ill. App. 3d at 972, 827 N.E.2d at 888. In Frye, 153

- 37 -

Ill. 2d at 32-33, 605 N.E.2d at 560, the supreme court relied on section 323 of the Restatement (Second) of Torts to determine whether the defendants proximately caused plaintiff's injury. Section 323 states:

"One who undertakes, gratuitously or for consideration, to render services to another which he should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from his failure to exercise reasonable care to perform his undertaking, if

(a) his failure to exercise such care increases the risk of such harm, or

(b) the harm is suffered because of the other's reliance upon the undertaking."

Restatement (Second) of Torts §323, at 135 (1965).

"Under Illinois law, a plaintiff's reliance on the defendant's promise is an independent, essential element in cases of nonfeasance." Bourgonje v. Machev, 362 Ill. App. 3d 984, 997, 841 N.E.2d 96, 108 (2005); Chisolm v. Stephens, 47 Ill. App. 3d 999, 1007, 365 N.E.2d 80, 86 (1977) ("Plaintiff correctly argues that liability for nonfeasance in connection with a gratuitous

undertaking may arise where the beneficiaries had relied on its performance. [Citations.] Under those circumstances[,] the element of reliance lies at the very heart of the cause of action, and is a basic and necessary prerequisite to liability"); Stephen v. Swiatkowski, 263 Ill. App. 3d 694, 704, 635 N.E.2d 997, 1005 (1994) (holding a plaintiff can only recover for nonfeasance if he "can show that he reasonably relied on the defendant for protection").

Here, the allegations in the complaint encompass a theory of misfeasance and nonfeasance.  In the complaint, plaintiff alleges defendants were negligent in their acts "done or omitted."  The court in Wakulich explained that the historical reason behind the distinction between nonfeasance and misfeasance was that "'[t]he mere breach of a promise, without more, was regarded as "non[]feasance," for which any action must be in assumpsit, upon the contract and upon proof of a consideration for the promise, rather than on the case under any theory of tort liability.'"  Wakulich, 203 Ill. 2d at 246, 785 N.E.2d at 856, quoting Restatement (Second) of Torts §323, Comment on Caveat d, at 138 (1965); see also W. Keeton, Prosser & Keeton on Torts §56, at 373-82 (5th ed. 1984).  However, the distinction is inconsequential in this case because the record contains no evidence sufficient to support a finding that defendants' action or inaction was the proximate cause of decedent's injury.  No

evidence was presented that decedent relied on defendants' flyer stating they would check for weapons or that decedent relied on defendants' alleged attempts at checking guests for weapons.

To establish proximate cause in this case, decedent must have relied on defendants' assertion that they would check for weapons in order to establish that defendants' conduct was the proximate cause of decedent's injury. In Chisolm, 47 Ill. App. 3d at 1007, 365 N.E.2d at 86, the supreme court stated:

"'Reliance may reasonably be placed where there is a deceptive appearance that performance had been made, or where a representation of performance has been communicated to plaintiff by defendant, or where plaintiff is otherwise prevented from obtaining knowledge or substitute performance of the undertaking.' [Citations.] Moreover, 'to justify reliance, [a] plaintiff must be unaware of the actual circumstances and not equally capable of determining such facts.'" Bourgonje, 362 Ill. App. 3d at 1005, 841 N.E.2d at 115, quoting Chisolm, 47 Ill. App. 3d at 1007, 365 N.E.2d at 86.

The court in Mann held that liability cannot be based on surmise or conjecture. Mann, 356 Ill. App. 3d at 974, 827

N.E.2d at 889. Rather, liability of a defendant can be established when there is a "reasonable certainty" that defendant's actions caused the injury. Mann, 356 Ill. App. 3d at 974, 827 N.E.2d at 889. Although direct evidence of decedent's reliance on defendants' promise to check for weapons was not presented, "reasonable certainty" may be established by inference from circumstantial evidence. Mann, 356 Ill. App. 3d at 975, 827 N.E.2d at 890 (decedent did not regain consciousness after being struck by a car in an intersection and instead plaintiff had to rely on eyewitness accounts of the accident to establish whether decedent relied on defendant's action in deciding to cross the street).

However, the test set forth in section 323 of the Restatement, and adopted by the supreme court in Wakulich, was apparently never considered during this trial. No evidence was presented that decedent or any other partygoer relied on defendants' voluntarily assumed duty to check for weapons. No evidence was presented as to when Davis came to the party, how Davis got inside the house, whether Davis was searched, how Davis was searched, or whether Davis was in possession of a gun when he arrived at the party. Rather, plaintiff argued to the trial court, and on appeal, that the mere fact that Davis had a gun at the party proves negligence on the part of defendants. In point of fact, the gun could have been in the household prior to the

party and its presence entirely unrelated to the search for weapons.

Plaintiff's conclusory argument, that "if there was a gun in the party, there must have been negligence," presents a <u>res</u> <u>ipsa</u> <u>loquitur</u> theory of negligence. Essentially, plaintiff argues that it is immaterial that she establish negligence on the part of any one defendant because the evidence of a gun in the party proves that at least one of the defendants must have been negligent. This was not the theory pleaded by plaintiff, nor is it compatible with the voluntary duty established in this case, which was to check for weapons.

Absent evidence establishing that decedent relied on defendants' undertaking, plaintiff failed to establish that defendants' conduct was the proximate cause of decedent's injury.

### III. CONCLUSION

By failing to present sufficient evidence to the court of defendants' breach or proximate cause, plaintiff failed to establish a <u>prima</u> <u>facie</u> case of negligence based on a voluntary assumption of a duty, and defendants were entitled to a directed verdict as a matter of law. Because we find defendants were entitled to a directed verdict, we decline to address defendants' additional arguments. Therefore, based on the foregoing reasons, we find the trial court erred in denying defendants' motion for a directed verdict. We reverse.

Reversed.

STEIGMANN, P.J., and KNECHT, J., concur.